# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

BEVERLY THOMPSON,

                              Plaintiff,

vs.

EQUIFAX INFORMATION
SERVICES, LLC, AND EXPERIAN
INFORMATION SOLUTIONS, INC.,

                              Defendants.

Case No.:

**JURY TRIAL
DEMANDED**

## COMPLAINT

Plaintiff Beverly Thompson ("Plaintiff" or "Ms. Thompson"), a living, breathing consumer, by and through her undersigned counsel, brings this Complaint against Defendants Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") and Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, et seq., arising out of a credit report that Defendants published and sold to Plaintiff's potential creditor, which astonishingly portrayed Plaintiff was deceased.

## INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately, this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do substantial economic and emotional damage whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    The three major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

5.    These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.    These CRAs also sell credit information to "resellers" of consumer reports, like Credit Plus, Inc. ("Credit Plus"), who assemble and merge the credit information obtained from the CRAs into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report and sell them to various mortgage lenders throughout the country.

7.    Merged infile credit reports are unique to the mortgage industry because applying for a mortgage loan is in many ways different than applying for other types of loans, as mortgage lenders typically require a credit score from all three of the CRAs before making a lending decision for a given consumer.

8.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

9.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

10.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

11.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

12.    Plaintiff's claims arise out of Defendants' blatantly inaccurate credit reporting, wherein Defendants reported to Plaintiff's potential creditors that she is "deceased" and does not have a credit score.

13.    Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

15.    Plaintiff Beverly Thompson ("Plaintiff") is a natural person who resides in Arcadia, Florida, and is a consumer as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a foreign limited liability company authorized to do business in the State of Florida, including in this District.

17.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a foreign limited liability company authorized to do business in the State of Florida, including in this District.

19.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## STATUTORY BACKGROUND

22.    Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or for credit, and they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

23.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

24.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

25.    Consumer reports that contain factually incorrect information are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## DEFENDANTS' PRACTICES
### Concerning the Sale of Reports on the "Deceased"

26.   The Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

27.   Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

28.   Defendants routinely place a "deceased" notation or marking on reports when they are advised by any of their data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

29.   Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30.   Defendants do not request or require a death certificate from any of their data sources, which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31.   Defendants also do not request or require any proof from any data source, which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32.    Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

33.    In some cases, in order to assure accuracy, Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased, or "U" undesignated code is furnished to them to be placed in said consumer's credit file or report.

34.    Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" or "U" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

35.     Defendants will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

36.     Defendants do not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

37.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

38.     Even in instances where the purportedly deceased consumer communicates directly with Equifax, Experian, and Trans Union, they do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

39.     Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer. Rather, Defendants will report that the consumer's credit score is "N/A."

40.    Defendants know that third party credit issuers require a credit score in order to process a given credit application.

41.    Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

42.    Defendants know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

43.    Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendants are inaccurately reporting them as "deceased" and without a credit score.

44.    Defendants have received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

45.    Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U" code, even when said consumers are not on the Death Master File and are in fact alive.

46.    Nevertheless, Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

47.    Defendants do not have any independent procedure to change an erroneous deceased status on its own and will merely parrot the furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

48.    Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

49.    For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

50.    Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them— meaning that no one is continuing to purchase reports about that consumer.

51.    Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

52.    Defendants profit from the sale of reports on deceased consumers.

53.    Defendants have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

54.    Defendants know that truly deceased consumers do not apply for credit.

55.    Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, the use of personal identifying information of deceased consumers is known to Defendants to be a common and major source of identity theft.

56.    Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

57.    Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

58.    Defendants have no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

59.    Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

60.     For deceased consumers, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants to sell their credit reports, absent a court order.

61.     Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

## FACTS

### Plaintiff Applies for a Home Mortgage Loan with NTFN

62.     Sometime in early February 2021, Plaintiff began searching for a new, permanent home and sought to be pre-approved for the financing of a home mortgage loan.

63.     At the time, she was living in a mobile home and had safety concerns during hurricane season and thought she should explore a brick & mortar or otherwise "fixed" home.

64.     She had begun working with a real estate agent and had identified some possible properties that were similar to what she might ultimately be interested in.

65.     The real estate agent recommended that Plaintiff applies for a mortgage pre-approval so that she could use that pre-approval to assist her with identifying an appropriate purchase price range to help her narrow her home search.

66.    The real estate agent also explained to Plaintiff that the mortgage pre-approval was a necessary first step before she could make an offer to purchase a particular home if she intended to finance the purchase and recommended that Plaintiff applies for a mortgage pre-approval from NTFN, Inc. ("NTFN").

67.    On or about February 24, 2021, Plaintiff submitted a credit application for a home mortgage loan pre-approval with NTFN.  A representative of NTFN obtained all of Plaintiff's personal identification information, including her Social Security number, and informed her that she needed to obtain all three of her credit reports and scores in order to determine the specific price range that NTFN could pre-approve her for financing purposes.

**NTFN Denies Plaintiff's Credit Application for a Home Mortgage Loan**

68.    On February 24, 2021, NTFN requested Plaintiff's credit reports and scores from Equifax, Experian, and Trans Union in the form of a Merged Infile Credit Report from Credit Plus.

69.    Credit Plus purchased Plaintiff's credit files from Experian and Trans Union and assembled and merged her credit information into a Merged Infile Credit Report, which it sold to NTFN.

70.    Credit Plus' Merged Infile Credit Report contained Plaintiff's Trans Union credit score; however, it failed to return a credit score from Experian and included the following notations: "NOT SCOREABLE," "NO SCORE

RETURNED, PLEASE SEE THE REPORT," "ONE ORE MORE RECORDS ON THE CONSUMER'S CREDIT FILE INCLUDES A REMARK THAT THE CONSUMER IS **DECEASED**,"[1] "THE PROFILE REPORT CONTAINS ONE OR MORE TRADELINES AS HAVING A **DECEASED** STATUS."

71.    Further, because CreditPlus employs an ordering mode when ordering credit reports from Equifax, Experian, and Trans Union, it sequences the requests in such a way so that so long as the first bureau returns a score, then the second bureau will be ordered and so long as the second bureau returns a score, then the third bureau will be ordered.  Because Experian failed to return a score, the Equifax report was not ordered.

72.    The Merged Infile Credit Report that Credit Plus sold to NTFN was patently incorrect on its face—it contained Plaintiff's Trans Union credit score but did not contain a credit score from Experian and failed to provide any information from Equifax. Further, the report contained alerts suggesting Plaintiff was deceased, and further, the Elan CACS CC account reported by both Experian and Trans Union contained an ECOA Code of X, denoting Plaintiff was deceased.  Trans Union's and Experian's deceased notations were patently incorrect because Plaintiff is alive and has a credit score.

---

[1] Emphasis added for purposes of this Complaint.

16

73.     Shortly after receiving the Merged Infile Credit Report from Credit Plus, the NTFN representative informed Plaintiff that NTFN was unable to move forward with the pre-approval process and would be denying her credit application due to a problem with her credit reports.

**Plaintiff Reviews Her Credit Reports from Equifax and Experian**

74.     Upon hearing of the Deceased notation on her credit files, Plaintiff was upset and emotionally devastated.  Plaintiff was not deceased she was very much alive.  And the deceased notation not only frightened her, but it also brought her deceased husband to mind.

75.     Plaintiff began to wonder how and why it was that she was being reported deceased.

76.     She wondered specifically whether somehow the deceased notation that should have been associated with her deceased husband was inaccurately being associated with her credit file.

77.     She wondered the impact of such a notation on her credit file, wondered what it meant, wondered what other possible impact would come of it, and worried what it meant for her credit needs, including emergency credit needs, and became increasingly agitated, anxious, unsettled, and upset.

78.     Suspecting that perhaps this wasn't a simple fluke, and that possibly the credit reporting agencies were confusing her with her recently deceased husband,

Plaintiff decided to order her credit reports as she very much still wanted to be able to move out of the mobile home because she feared that her mobile home could not withstand another hurricane season.

79.    Sometime in late August or early September, Plaintiff requested a copy of her Equifax and Experian credit files.

80.    On September 29, 2021, Equifax and Experian each issued a copy of Plaintiff's credit file and mailed it to her.

81.    On or about October 5, 2021, Plaintiff received her Experian report, but the information Experian disclosed to her did not mention that there was a deceased code on her credit file.  Plaintiff was very confused because Experian told CreditPlus she was deceased and failed to provide a credit score.  She reasonably believes this to be the reason NTFN would not extend her credit.  Now she was more worried than ever about her Experian credit file.

82.    On or about October 5, 2021, Plaintiff received her Equifax report and was shocked to discover that Equifax was reporting the following account with a status that included "Consumer is Deceased:"

> a.  Elan Financial Services
>     Account# 414776857179****
>     Date Opened: 06/01/2015
>     Status: Consumer is Deceased

83.    Equifax and Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information they published and maintain concerning Plaintiff.

**Plaintiff's Dispute to Equifax Regarding Their Inaccurate Credit Reporting**

84.    On or about December 7, 2021, extremely shocked, worried, and confused about Equifax's deceased notation on her credit file, Plaintiff mailed a written dispute letter to Equifax disputing the inaccurate "deceased" notation on her credit file. Plaintiff attached a copy of the inaccurate report to the dispute.

85.    Sometime in late December 2021 or early January 2022, Plaintiff received Equifax's Investigation Results which stated that Equifax reinvestigated her dispute and updated Account #414776857179**** to "*no longer report as deceased*."

86.    Plaintiff feared that if she attempted again to apply for a mortgage pre-approval, she would once again be embarrassed by another deceased code issue.

87.    Plaintiff ceased searching for a new home and stopped working with her realtor. She feared any future credit applications would go the same way as the last, to her humiliation and anguish.

88.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit for a home mortgage loan; being denied the ability to purchase a home; loss of credit; loss of the ability to

purchase, and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIM FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (Claim for Relief Against Defendants Equifax and Experian)

89.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-88 as if fully stated herein.

90.    Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

91.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit for a home mortgage loan; being denied the ability to purchase a home; loss of credit; loss of the ability to purchase, and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the

inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

92.    Defendants' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

93.    Plaintiff is entitled to recover attorney's fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that Defendants negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs from Defendants as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

94. Plaintiff demands a trial by jury.

Date:___April 25, 2022___

**VARNELL & WARWICK, P.A.**

By:  /s/ Janet R. Varnell

Janet R. Varnell, FBN: 0071072
Brian W. Warwick, FBN: 0605573
Matthew T. Peterson, FBN: 1020720
Erika Willis, FBN: 100021
1101 E. Cumberland Ave., Ste. 201H, #105
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
*jvarnell@vandwlaw.com*
*bwarwick@vandwlaw.com*
*mpeterson@vandwlaw.com*
*ewillis@vandwlaw.com*
*kstroly@vandwlaw.com*

Date:___April 25, 2022___

**BERGER MONTAGUE, PC**

By: /s/ Sylvia S. Bolos

Sylvia S. Bolos, MI Bar No. 78715*
Hans W. Lodge, MN Bar No. 0397012*
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (215) 875-4603
Fax: (612) 584-4470
sbolos@bm.net
hlodge@bm.net

*Pro Hac Vice Forthcoming*

*ATTORNEYS FOR PLAINTIFF*